**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| eTOOL DEVELOPMENT, INC., and eTOOL | § | |
| PATENT HOLDINGS CORP., | § | |
|     Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 2:08-CV-196-TJW |
| | § | |
| NATIONAL SEMICONDUCTOR | § | |
| CORPORATION, | § | |
|     Defendant. | § | |

**MEMORANDUM OPINION AND ORDER**

In the underlying lawsuit, eTool Development, Inc. and eTool Patent Holdings Corporation (hereinafter "eTool" or "Plaintiff") sue Defendant National Semiconductor Corporation ("National") for patent infringement of U.S. Patent No. 7,113,919 ('919 Patent). The parties dispute eight terms in the '919 Patent for claim construction purposes. Further, within those eight terms, there are two terms that National argues are indefinite. The Court held a hearing regarding claim construction at 9:00 a.m. on Wednesday, August 17, 2011. This Memorandum Opinion and Order outlines the Court's construction of the various disputed terms and the Court's ruling on National's indefiniteness arguments.

## I.      BACKGROUND AND PLAINTIFF'S PATENT

The '919 Patent is entitled "System and Method for Configuring Products Over a Communications Network." The abstract of the '919 Patent reads:

> The invention relates to a system and method for the automated selection of formulations and/or formulation components by specifying product characteristics. In particular, the system and method serve customers within market segments that use selected components as raw materials for manufacture of specialty products and that require an understanding of how the selected components effect [sic] performance. For example, such products as electronic circuits, coatings, adhesives, sealants, inks, polishes, cleaners, and detergents fall within the profile of such products.

Claim 1 of the '919 Patent reads:

1. A method for a supplier of at least one supplier specific specialty component to provide a customer with technical support information for making a supplier specific formulation having certain characteristics over a network-based system so as to permit the customer to make the formulation from the at least one supplier specific specialty component promoted and offered for sale by the supplier to the customer, the method comprising:

> providing a computer database comprising promotional information specific to the at least one specialty component, a supplier offer to sell the at least one specialty component and supplier technical support information for making a plurality of product formulations using the at least one specialty component;

> classifying in the computer database the plurality of product formulations according to a set of product characteristics for each of said formulations;

> receiving over the network from the customer a plurality of inputs indicative of a set of customer preferred characteristics;

> presenting over the network to the customer supplier technical support information comprising a plurality of formulation constituent components including the at least one specialty component for each of said plurality of formulations corresponding to said set of characteristics received from the customer so that the customer may select different combinations of said components to be used with the at least one specialty component so as to allow the customer to create different trial formulations;

> receiving over the network from the customer another input selecting at least one particular combination of constituent components to be used in combination with the at least one specialty component for use in creating at least one trial formulation;

> presenting over the network to the customer technical support information for said at least one trial formulation including performance characteristics for said at least one trial formulation, said performance characteristics being substantially consistent with and supplemental to the customer preferred characteristics;

> presenting over the network to the customer the promotional information specific to the at least one specialty component; and presenting over

the network to the customer an offer sell the at least one specialty component.

## II.   GENERAL PRINCIPLES GOVERNING CLAIM CONSTRUCTION AND INDEFINITENESS

"A claim in a patent provides the metes and bounds of the right which the patent confers on the patentee to exclude others from making, using or selling the protected invention." *Burke, Inc. v. Bruno Indep. Living Aids, Inc.*, 183 F.3d 1334, 1340 (Fed. Cir. 1999).  Claim construction is an issue of law for the court to decide.  *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-71 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996).

To ascertain the meaning of claims, the court looks to three primary sources: the claims, the specification, and the prosecution history.  *Markman*, 52 F.3d at 979.  The specification must contain a written description of the invention that enables one of ordinary skill in the art to make and use the invention.  *Id.*  A patent's claims must be read in view of the specification, of which they are a part.  *Id*.  For claim construction purposes, the description may act as a sort of dictionary, which explains the invention and may define terms used in the claims.  *Id*.  "One purpose for examining the specification is to determine if the patentee has limited the scope of the claims."  *Watts v. XL Sys., Inc.*, 232 F.3d 877, 882 (Fed. Cir. 2000).

Nonetheless, it is the function of the claims, not the specification, to set forth the limits of the patentee's invention.  Otherwise, there would be no need for claims.  *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) (en banc).  The patentee is free to be his own lexicographer, but any special definition given to a word must be clearly set forth in the specification.  *Intellicall, Inc. v. Phonometrics, Inc.*, 952 F.2d 1384, 1388 (Fed. Cir. 1992).  Although the specification may indicate that certain embodiments are preferred, particular embodiments appearing in the specification will not be read into the claims when the claim

language is broader than the embodiments.  *Electro Med. Sys., S.A. v. Cooper Life Sciences, Inc.*, 34 F.3d 1048, 1054 (Fed. Cir. 1994).

This Court's claim construction decision must be informed by the Federal Circuit's decision in *Phillips v. AWH Corporation*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc).  In *Phillips*, the court set forth several guideposts that courts should follow when construing claims.  In particular, the court reiterated that "the *claims* of a patent define the invention to which the patentee is entitled the right to exclude."   415 F.3d at 1312 (emphasis added) (*quoting Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)).  To that end, the words used in a claim are generally given their ordinary and customary meaning.  *Id*.  The ordinary and customary meaning of a claim term "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application."   *Id*. at 1313.  This principle of patent law flows naturally from the recognition that inventors are usually persons who are skilled in the field of the invention and that patents are addressed to and intended to be read by others skilled in the particular art.  *Id*.

The primacy of claim terms notwithstanding, *Phillips* made clear that "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification."   *Id*.  Although the claims themselves may provide guidance as to the meaning of particular terms, those terms are part of "a fully integrated written instrument."   *Id*. at 1315 (quoting *Markman*, 52 F.3d at 978).  Thus, the *Phillips* court emphasized the specification as being the primary basis for construing the claims.  *Id*. at 1314-17.  As the Supreme Court stated long ago, "in case of doubt or ambiguity it is proper in all cases to refer back to the descriptive

portions of the specification to aid in solving the doubt or in ascertaining the true intent and meaning of the language employed in the claims." *Bates v. Coe*, 98 U.S. 31, 38 (1878).  In addressing the role of the specification, the *Phillips* court quoted with approval its earlier observations from *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998):

> Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim.  The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.

*Phillips*, 415 F.3d at 1316.  Consequently, *Phillips* emphasized the important role the specification plays in the claim construction process.

The prosecution history also continues to play an important role in claim interpretation. Like the specification, the prosecution history helps to demonstrate how the inventor and the PTO understood the patent.  *Id.* at 1317.  Because the file history, however, "represents an ongoing negotiation between the PTO and the applicant," it may lack the clarity of the specification and thus be less useful in claim construction proceedings.  *Id.*  Nevertheless, the prosecution history is intrinsic evidence that is relevant to the determination of how the inventor understood the invention and whether the inventor limited the invention during prosecution by narrowing the scope of the claims.  *Id.*

*Phillips* rejected any claim construction approach that sacrificed the intrinsic record in favor of extrinsic evidence, such as dictionary definitions or expert testimony.  The *en banc* court condemned the suggestion made by *Texas Digital Systems, Inc. v. Telegenix, Inc.*, 308 F.3d 1193 (Fed. Cir. 2002), that a court should discern the ordinary meaning of the claim terms (through dictionaries or otherwise) before resorting to the specification for certain limited purposes.

*Phillips*, 415 F.3d at 1319-24.  The approach suggested by *Texas Digital*—the assignment of a limited role to the specification—was rejected as inconsistent with decisions holding the specification to be the best guide to the meaning of a disputed term.  *Id.* at 1320-21.  According to *Phillips*, reliance on dictionary definitions at the expense of the specification had the effect of "focus[ing] the inquiry on the abstract meaning of words rather than on the meaning of claim terms within the context of the patent."  *Id.* at 1321.  *Phillips* emphasized that the patent system is based on the proposition that the claims cover only the invented subject matter.  *Id.*  What is described in the claims flows from the statutory requirement imposed on the patentee to describe and particularly claim what he or she has invented.  *Id.*  The definitions found in dictionaries, however, often flow from the editors' objective of assembling all of the possible definitions for a word.  *Id.* at 1321-22.

*Phillips* does not preclude all uses of dictionaries in claim construction proceedings. Instead, the court assigned dictionaries a role subordinate to the intrinsic record.  In doing so, the court emphasized that claim construction issues are not resolved by any magic formula.  The court did not impose any particular sequence of steps for a court to follow when it considers disputed claim language.  *Id.* at 1323-25.  Rather, *Phillips* held that a court must attach the appropriate weight to the intrinsic sources offered in support of a proposed claim construction, bearing in mind the general rule that the claims measure the scope of the patent grant.

Also at issue in this case is whether certain claims of the patents-in-suit are indefinite.  A claim is invalid for indefiniteness if it fails to particularly point out and distinctly claim the subject matter that the applicant regards as the invention.  35 U.S.C. § 112, ¶ 2.  To prevail on an indefiniteness argument, the party seeking to invalidate a claim must prove "by clear and convincing evidence that a skilled artisan could not discern the boundaries of the claim based on

the claim language, the specification, and the prosecution history, as well as her knowledge of the relevant art area." *Halliburton Energy Services, Inc. v. M-I LLC*, 514 F.3d 1244, 1249-50 (Fed. Cir. 2008). The primary purpose of the definiteness requirement is to ensure public notice of the scope of the patentee's legal right to exclude, such that interested members of the public can determine whether or not they infringe. *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed. Cir. 2005); *Halliburton*, 514 F.3d at 1249; *Honeywell Int'l Inc. v. Int'l Trade Comm'n*, 341 F.3d 1332, 1338 (Fed. Cir. 2003). Courts apply the general principles of claim construction in their efforts to construe allegedly indefinite claim terms. *Datamize,* 417 F.3d at 1348; *Young v. Lumenis, Inc.*, 492 F.3d 1336, 1346 (Fed. Cir. 2007). A claim is indefinite only when a person of ordinary skill in the art is unable to understand the bounds of the claim when read in light of the specification. *Miles Labs., Inc. v. Shandon, Inc.*, 997 F.2d 870, 875 (Fed. Cir. 1993); *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1371 (Fed. Cir. 2008). A determination of claim indefiniteness is a conclusion of law. *Exxon Research & Eng'g Co. v. United States,* 265 F.3d 1371, 1375-76 (Fed. Cir. 2001); *Datamize,* 417 F.3d at 1347.

A claim is indefinite only if the claim is "insolubly ambiguous" or "not amenable to construction." *Exxon,* 265 F.3d at 1375; *Young,* 492 F.3d at 1346; *Halliburton*, 514 F.3d at 1249; *Honeywell*, 341 F.3d at 1338-39. A court may find a claim indefinite "only if reasonable efforts at claim construction prove futile." *Datamize*, 417 F.3d at 1347. A claim term is not indefinite solely because the term presents a difficult claim construction issue. *Id.*; *Exxon*, 265 F.3d at 1375; *Honeywell*, 341 F.3d at 1338. "If the meaning of the claim is discernable, even though the task may be formidable and the conclusion may be one over which reasonable persons will disagree, . . . the claim [is] sufficiently clear to avoid invalidity on indefiniteness grounds." *Exxon*, 265 F.3d at 1375; *Halliburton*, 514 F.3d at 1249.

## III.    AGREED CONSTRUCTIONS FROM THE '919 PATENT

The parties have agreed to the following constructions, and the Court adopts these constructions as the construction of the Court.

| Claim Term/Phrase | Agreed Construction |
|---|---|
| "supplier specific specialty component" | "a specialty component provided by a particular supplier" |
| "supplier specific formulation" | "a formulation having a specific supplier specific specialty component" |
| "offer to sell the specialty component" | "to make available for purchase either directly or from a distributor a specialty component, whether alone or along with other components" |
| "performance characteristics being substantially consistent with and supplemental to the characteristics of the customer input" | "substantially conform to and additional to" |
| "match," "matched," "matching," "corresponding to" | "substantially conform to" |
| "matching formulations" | "formulations that substantially conform to customer-specified characteristics" |
| "server can match the product formulations stored in said server to said set of characteristics" | "server can match formulations stored in said server to a set of customer specified characteristics" |

## IV.    TERMS IN DISPUTE FROM THE '919 PATENT

### a.   "specialty component"

| Claim Language | eTool's Proposed Construction | National's Proposed Construction |
|---|---|---|
| "1. A method for a supplier of at least one supplier specific **specialty component** to provide a customer with technical support information for making a supplier specific formulation having certain characteristics over a network-based system so as to permit the customer to make the formulation from the at least one supplier specific **specialty component** promoted and offered for sale by the supplier to the customer . . . ." | "a particular non-fungible component for use in combination with commodity components" | The term "specialty component" is indefinite.<br><br>In the alternative, if the term is not found indefinite, National proposes:<br><br>"a particular component that may be promoted and offered for sale and used in combination with other components" |

The parties seek construction of the term "specialty component," which appears in claim 1 and other claims.  Plaintiff eTool proposes that the term be construed as "a particular non-fungible component for use in connection with commodity components."  Defendant National argues the term is indefinite, or alternatively, if the Court does not find it indefinite, it should be construed as "a particular component that may be promoted and offered for sale and used in combination with other components."  Aside from whether the term is indefinite, there are two primary disputes that appear in the parties' proposed constructions.  First, eTool argues the patent is clear that a "specialty component" is distinguished from commodity components (or other components) because it is non-fungible.  National disagrees that "specialty component" is so limited.  Second, the parties disagree whether the "specialty component" must be "for use in combination with *commodity* components," as eTool requests, or, whether the "specialty component" may be "promoted and offered for sale and used in combination with *other* components" (i.e., not limited to commodity components).

### 1.  The Parties' Construction Arguments

Plaintiff eTool essentially argues that when one reads the first three columns of the '919 Patent, it is clear that: (1) a specialty component is distinguishable from a commodity component because the commodity component is fungible and the specialty component is not; and (2) the non-fungible specialty component is used (at least in the context of this invention) in connection with other fungible commodity components.  More specifically, in support of Plaintiff's first point, the '919 Patent states that "*[u]nlike commodity chemicals* that are *fungible and price driven*, tech service for *specialties* can make all the difference in the selling process to maintain premium pricing." '919 Patent, 3:7-10 (emphasis added).  In support of the second point, for example, the '919 Patent explains that "[f]ormulations are developed by combining multiple specialty and commodity chemicals ("ingredients") supplied by specialty and industrial chemical suppliers." *Id.* at 5:52-54.  Of course, Plaintiff argues that the term "specialty component" is not indefinite because its construction is readily determinable by the '919 Patent specification, as evidenced by its arguments above.

Defendant National argues that the term "specialty component" is indefinite because one of ordinary skill could not always distinguish it from other components.  As such, a competitor could not determine whether he or she infringes the claim.  The particular portion of the specification which National points to reads as follows:

> The specialty component of industrial chemicals encompasses chemicals that are the primary building blocks for delivering value-added products in a wide range of industries. Specialties are typically blended or 'formulated' with industrial commodities to provide the unique performance features that an industrial manufacturer would require. Historically, *many* specialties have been proprietary in nature and therefore had a *limited* number of competitive alternatives. Key trends of the past few years have been the maturation of technology, the globalization of specialty chemical suppliers and the resultant advent of price competition. In specialties, a *growing number* of suppliers can offer very similar technology. In cases where there is little other know-how, service or value that

> accompanies the sale of such a specialty, price has become the lowest common denominator, and the *product has become more of a commodity.*

*Id.* at 2:44-60 (emphasis added).  Here, the patent discusses how under certain circumstances, a specialty component might become more of a commodity.  The quote also uses qualified language such as "many," "limited number," and "growing number."  Thus, Defendant argues it is apparently a "sliding scale" regarding when a component is a "specialty" or "commodity."  Further, Defendant argues that a component could be a "specialty" component at one point and be infringing, but then later the component might be a "commodity" component and not infringe.  As a result, because the patent is not clear when something is a specialty component or commodity component, the public is not on notice as to when someone is infringing and thus the term is indefinite.

But if the Court does not find the term indefinite, Defendant argues its alternative proposed construction should be adopted.  As stated above, Defendant's proposed construction reads as "a particular component that may be promoted and offered for sale and used in combination with other components."  Defendant argues that the "specialty component" may be promoted and offered for sale.  In support, Defendant points to language in the patent and the prosecution history.  For example, Defendant points to claim 1, where it states in pertinent part: "presenting over the network to the customer the *promotional information specific to the at least one specialty component* [and] *offer to sell the at least one specialty component*."  *Id.* at 14:54-58 (emphasis added).  Additionally, Defendant argues that Plaintiff eTool is incorrect to limit the construction of "specialty component" as being required to be used "in combination with *commodity* components."  This is because the claims show that a specialty component can also be used in combination with another specialty component.  *See id.* at 19:37-39, Claim 35

("including a formulation for making a formulation from the specialty component used with other specialty components").

## 2.  Analysis

The Court concludes that Defendant has not proven by clear and convincing evidence that the term "specialty component" is indefinite.  To prevail on an indefiniteness claim, the party seeking to invalidate a claim must prove "by clear and convincing evidence that a skilled artisan could not discern the boundaries of the claim based on the claim language, the specification, and the prosecution history, as well as her knowledge of the relevant art area." *Halliburton*, 514 F.3d at 1249-50.  "[A] claim is indefinite under § 112 ¶ 2 if it is insolubly ambiguous, and no narrowing construction can properly be adopted."  *Amgen, Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1342 (Fed. Cir. 2003) (internal citations and quotations omitted).  In addition, "close questions of indefiniteness in litigation involving issued patents are properly resolved in favor of the patentee."  *Bancorp Services, L.L.C. v. Hartford Life Ins. Co.*, 359 F.3d 1367, 1371 (Fed. Cir. 2004).

In the present case, though it is a close question, the Court holds that a narrowing construction can properly be adopted for the term "specialty component."  The patent distinguishes specialty components from other components adequately enough for one of ordinary skill in the art to distinguish a specialty component from another component.  In this Court's view, the '919 Patent provides three clarifications with respect to the term "specialty component" that allows the Court to adopt a narrowing construction and, therefore, find that the term is not indefinite.  First, the '919 Patent teaches that a "specialty component" is not fungible. *See* '919 Patent, 3:7-10 ("*Unlike commodity chemicals* that are *fungible* and *price driven*, tech service for *specialties* can make all the difference in the selling process to maintain premium

pricing.") (emphasis added).  Second, the '919 Patent teaches that a "specialty component" is a component wherein customers do not choose to purchase the "specialty component" solely based on its price (i.e., it is not price driven).  *See id.*  Third, a "specialty component" has a limited number of competitive alternatives.  *See id.* at 2:49-53 ("Historically, many specialties have been proprietary in nature and therefore had a *limited number of competitive alternatives*.") (emphasis added).

The Court observes National's argument that the patent is ambiguous because one paragraph, *see* '919 Patent, 2:44-60, indicates that whether a component is a "specialty component" can be, to some degree, a sliding scale.  National argues this makes the term "specialty component" insolubly ambiguous because one of ordinary skill in the art could not determine the bounds of the claim language.  The Court disagrees.  Although the patentee does not define the term "specialty component" with one-hundred percent certainty, "[a] patentee need not define his invention with mathematical precision in order to comply with the definiteness requirement."  *Hearing Components, Inc. v. Shure Inc.*, 600 F.3d 1357, 1367 (Fed. Cir. 2010).  In addition, by providing the three clarifications the Court discussed above, the patentee provided enough detail for one of ordinary skill in the art to understand the term "specialty component."  And as discussed below, because this Court is incorporating those three clarifications into its claim construction of the term "specialty component," one skilled in the art would understand the bounds of the claim.  *See Invitrogen Corp. v. Biocrest Mfg., L.P.*, 424 F.3d 1374, 1383 (Fed. Cir. 2005) ("Because this court construed the phrase 'improved competence' in *Invitrogen I* such that one skilled in the art would understand the bounds of the claim, this court detects no unacceptable indefiniteness in that language in this appeal.").

With respect to the parties' proposed constructions, the Court does not accept either parties' proposal in its entirety.   As indicated above, Plaintiff is correct that the patent distinguishes a specialty component from other components, such as a commodity component, because it is non-fungible.   *See* '919 patent, 3:7-10 ("*[u]nlike commodity chemicals* that are *fungible and price driven*, tech service for *specialties* can make all the difference in the selling process to maintain premium pricing") (emphasis added).   On the other hand, Defendant is correct that the specialty components should not be limited to being used in combination with only commodity components, which might be how eTool's proposed construction is interpreted. This is because claim 35 states that specialty components may be combined with other specialty components.   But Defendant is incorrect, however, that the Court should include the limitation that the specialty component be "promoted and offered for sale."   Including that limitation in the construction of "specialty component" would be redundant because that limitation is already included, for example, in claim 1.   *See id.* at 14:54-58 ("presenting over the network to the customer the *promotional information specific to the at least one specialty component* [and] and *offer to sell the at least one specialty component*") (emphasis added).   Further, nowhere in the specification is there any requirement that the specialty component itself be promoted and offered for sale, as Defendant's construction requires.   Therefore, considering those points, and the three clarifications discussed above, which this Court incorporates into the construction, the Court adopts the following construction for "specialty component":

> A "specialty component" is a particular component that is used in combination with other components, where the "specialty component" is non-fungible, is not purchased by customers solely based on its price, and has a limited number of competitive alternatives.

### b.  "interchangeable substitutes"

| Claim Language | eTool's Proposed Construction | National's Proposed Construction |
|---|---|---|
| "8. The method of claim 1 further comprising: receiving over the network from the customer a request for a list of **interchangeable substitutes** for at least one of the constituent components used in combination with the at least one specialty component in the at least one trial formulation; and presenting over the network to the customer the list of **interchangeable substitutes**, each of the **interchangeable substitutes** providing substantially the same performance characteristics for the at least one trial formulation." | A component that is not a specialty component that can replace another, fungible or commodity, component. | Components that are capable of being replaced by each other. |

The disputed term "interchangeable substitutes" appears in claim 8 and other claims. Plaintiff eTool proposes a construction that reads: "A component that is not a specialty component that can replace another, fungible or commodity, component."  National proposes a construction that reads: "Components that are capable of being replaced by each other."  The real dispute is whether the construction for the term "interchangeable substitute" can include a specialty component (i.e. as National's construction allows) or not.

### 1.  The Parties' Construction Arguments

Plaintiff argues that an "interchangeable substitute" cannot be a specialty component because a specialty component, by definition in the '919 Patent, is non-fungible (i.e., not readily exchangeable or easily substitutable).  So essentially, Plaintiff's argument is that it is the antithesis of the '919 Patent for the specialty component to be an interchangeable substitute.  For support, Plaintiff uses the language in the '919 Patent and also the prosecution history.  Claim 8 claims "receiving over the network from the customer a request for *a list of interchangeable substitutes* for at least one of the constituent components *used in combination with the at least*

*one specialty component* in the at least one trial formulation . . . ."  '919 Patent, 15:25-29

(emphasis added).   The specification discusses how it is the commodity components that are

interchangeable.   *See id.* at 6:53-55; 12-61-65.   Finally, Plaintiff points out that the prosecution

history includes a definition of "interchangeable substitute":

> Patentable interactivity . . . involves the identification of "interchangeable
> substitutes" for the other constituents used with the specialty component, *e.g.,*
> *substitutes for the commodities in the case of specialty chemicals and substitutes*
> *for the passive components in the case of an integrated circuit.*

(*See* Response to July 28, 2005 Office Action, at 31, attached as Ex. 6 to Dkt. No. 130 (emphasis

added).)

Defendant argues that "interchangeable substitutes" should not be excluded from

including the specialty component because that would be improperly importing limitations from

the specification.   Defendant's biggest argument is that claim 35 shows that a specialty

component may be used with another specialty component.   Then claim 38, that depends from

claim 35, discusses "interchangeable substitutes" in connection with the constituent components

in claim 35, which arguably includes the specialty components.   Therefore, Defendant argues

that if "interchangeable substitutes" could not include specialty components, then the

construction would be reading out claims 35 and 38.

### 2.   Analysis

The Court agrees with Defendant.   Claims 35 and 38 show how a specialty component

may also have an interchangeable substitute.   To illustrate, claim 35, in the preamble, discusses

"a formulation for making a formulation from the *specialty component* used with *other specialty*

*components* . . . ."  '919 Patent, 19:37-39 (emphasis added).   Then, claim 35 later describes

"formulations including the specialty component and at least one other constituent component . .

. ."  *Id.* at 19:48-50.   The term "constituent component" is not a term that has been requested to

be construed by the parties, but in this instance, it appears the "one other constituent component" is referring to (although not exclusively referring to) the "other specialty components" mentioned in the preamble.    Furthermore, claim 38, which depends from claim 35, describes how "interchangeable substitutes" may be used for the constituent components in claim 35.    That leads to the conclusion that the constituent components can be specialty components in some instances, and that these specialty components may have interchangeable substitutes, which could be another specialty component.

The Court understands Plaintiff's argument that something that is considered "non-fungible" (as the Court has construed "specialty component") generally means that it is not readily exchangeable.    However, this general definition cannot warrant the Court completely reading out a potential embodiment from claims 35 and 38.    Therefore, for that reason, the Court holds that "interchangeable substitutes" is not limited to components not including a specialty component.    The Court construes "interchangeable substitute" as "*components that are capable of being replaced by each other*."

### c. "formulation"

| Claim Language | eTool's Proposed Construction | National's Proposed Construction |
|---|---|---|
| "1. A method for a supplier of at least one supplier specific specialty component to provide a customer with technical support information for making a supplier specific **formulation** having certain characteristics over a network-based system so as to permit the customer to make the **formulation** from the at least one supplier specific specialty component promoted and offered for sale by the supplier to the customer . . . ." | "Information that imparts the understanding to build at least a prototype product." | The term "formulation is indefinite.<br><br>In the alternative, if this term is not found to be indefinite, and if the Court determines that both the "assembled product" and "product specification" elements from the specification are deemed appropriate for inclusion in the construction, National proposes the following construction:<br><br>"An assembled product or product specification wherein the product is assembled from one or more components and wherein the specification imparts the understanding to build at least a prototype product."<br><br>As a second alternative, if the Court determines that only the "product specification" element from the specification is deemed appropriate for inclusion in the claim construction, National proposes the following construction:<br><br>"A product specification that imparts the understanding to build at least a prototype product." |

The term "formulation" appears in claim 1 and other claims. Defendant argues the term "formulation" is indefinite. But if the Court does not find the term indefinite, then Defendant proposes two alternative constructions, which are in the table above. Plaintiff's newest proposed construction is "information that imparts the understanding to build at least a prototype product." If the term is not indefinite, then the dispute now turns on whether the Court should adopt Plaintiff's language, which uses the word "information," versus Defendant's language, which uses the words "product specification" and/or "assembled product."

### 1.  The Parties' Construction Arguments

Plaintiff argues the specification defines formulation when it states:

> [T]he supplier must not only be inform customers of the availability of the new component *but must also inform customers how to integrate the component into an assembled product or formulation (both referred to herein by the term "formulation")*.

'919 Patent, at 1:27-31 (emphasis added). Plaintiff also relies on the prosecution history, where the patentee stated:

> It is clear from this 102 rejection that the Examiner has construed the word "Formulation" to be synonymous with identification of a "product" as contrasted with *information* which would permit one to make or formulate a product.

(Dkt. No. 130, at 17 (emphasis added).) Primarily due to these statements in the specification and prosecution history, and also by compromising with Defendant and using Defendant's language of "prototype product," Plaintiff argues the construction of "formulation" should be "information that imparts the understanding to build at least a prototype product."

On the other hand, Defendant offers two constructions. Defendant's first proposed construction is for the Court to construe the term "formulation" as "an assembled product or product specification wherein the product is assembled from one or more components and wherein the specification imparts the understanding to build at least a prototype product." Defendant gets this proposed construction primarily from combining two different statements in the specification. The first statement Defendant relies on is the same that Plaintiff relies on— where the specification refers to the "assembled product or formulation (both referred to herein by the term 'formulation')." '919 Patent, 1:29-31. Defendant interprets this phrase differently than Plaintiff, and argues that the term "both" is referring to the "assembled product" and "formulation." As a result, Defendant argues this shows that the formulation may also be the assembled product. The second statement Defendant relies on is in the detailed description section of the '919 Patent where it almost defines "formulation":

> The present invention is directed to an Internet-based platform that aggregates formulations (i.e., product specifications wherein the product is assembled from one or [sic] components and wherein the specification imparts the understanding to build at least a prototype product) . . . .

'919 Patent, 5:10-15.  As a result, Defendant's first proposed construction essentially copies the language from column 5, lines 10-15 and adds the word "assembled product" from column 1, line 30 of the patent.

Alternatively, Defendant's other proposed construction is "a product specification that imparts the understanding to build at least a prototype product."  This construction is primarily lifted from the statement in the specification on column 5, lines 10-15 that was just quoted.  *See id.*  The primary difference in Defendant's alternative proposed constructions is that one includes the language "assembled product" and one does not.

Finally, Defendant argues that it is not clear whether the patentee is referring to a product or merely the specification of a product when the patent uses the term "formulation," and as a result, that term is indefinite.

## 2.  Analysis

The Court adopts Defendant's alternative construction for "formulation" that reads: "a product specification that imparts the understanding to build at least a prototype product."  The Court holds that the term "formulation" is not indefinite.

With respect to indefiniteness, most of the potential ambiguity in the term "formulation" arises from where the patent states:

> [T]he supplier must not only be inform customers of the availability of the new component *but must also inform customers how to integrate the component into an assembled product or formulation (both referred to herein by the term "formulation")*.

'919 Patent, at 1:27-31 (emphasis added).  The parties argue for different interpretations of this quote.  Certainly, Defendant's argument is plausible—that the formulation can also be the "assembled product."  Defendant's interpretation takes the simple position that "both" refers to the immediately preceding "assembled product" and "formulation."  From a pure grammatical standpoint, Defendant has a good argument.  But considering the context of this quote, the prosecution history that Plaintiff quotes, and the rest of the patent as a whole, the Court holds that the patentee did not intend for the term "formulation" to encompass the term "assembled product."

The Court's interpretation is correct for several reasons.  First, the patentee's comments in the prosecution history make clear that the patentee did not intend for the word "formulation" to be interpreted as including the "assembled product."  The patentee, in prosecution history, specifically argued that the term "formulation" was not synonymous with the identification of a product.  (*See* Ex. 3, attached to Dkt. No. 154, Response to Office Action dated Sept. 23, 2003, at 16 ("all of these [incorrect] conclusions appear to be based on the [incorrect] assumption that the term 'formulation' can be used interchangeably with the term 'product' and does not require the disclosure of information for making a product").)   Second, the lack of clarity in the quoted sentence is most likely attributable to the patentee trying to use the same language when referring to the chemical and electronics industry, which is difficult.[1]  And finally, contrary to

---

[1] At that point in the patent, the patent is discussing the invention with respect to both the "specialty chemical" industry and the "electronics" industry.  Specifically, just before the quote above, the patent was discussing "a new integrated circuit or new specialty chemical."  '919 Patent, at 1:26-27.  But the industries are different.  For example, the term "formulation" is easily understood when used in the specialty chemistry industry, as, in this patent, it may be referring to the "formula," or "recipe," or "product specification" of a can of paint.  This is illustrated when the patent mentions a "paint formulation," *id.* at 1:53, or when the patent gives a table that shows the "formulation" of a paint.  *See id.*, at 9:40-65.  But in the electronics industry, the term "formulation" does not appear to be as common of a phrase—instead, the term "product specification" (i.e., the assembled product in the abstract) is more commonly understood.

Defendant's representations,[2] in this Court's view, there is nowhere else in the '919 Patent where the term "formulation" is clearly referring to an assembled product.  Therefore, for these reasons, the Court holds that "formulation" does not refer to the assembled product, and consequently, the Court holds that the term is not indefinite.  Likewise, for the same reason, the Court rejects Defendant's proposed alternative construction of "formulation" that includes the term "assembled product."

The last dispute that must be resolved is whether the Court accepts Plaintiff's use of "information" in its construction or Defendant's use of "product specification" in its construction.  As illustrated above, Plaintiff's construction is mainly supported by the prosecution history.  Defendant's construction, however, is strongly supported by the specification, as the specification nearly defines "formulation" at one point.  '919 Patent, 5:10-15 (emphasis added) ("The present invention is directed to an Internet-based platform that aggregates *formulations (i.e., product specifications wherein the product is assembled from one or [sic] components and wherein the specification imparts the understanding to build at least a prototype product) . . . .*").  As a result, holds that Defendant's alternative construction is the most supported by the intrinsic record, so the Court construes "formulation" as "*a product specification that imparts the understanding to build at least a prototype product.*"

---

Indeed, as Defendant notes, the patent later describes "formulation" as essentially being a product specification, and the Court adopts that construction.

[2] The Court disagrees with Defendant that claim 1 uses the term "formulation" in a way that requires "formulation" to be an assembled product.  For example, the claim generally discusses "making a . . . formulation," but if this were considered in the paint context, one may actually "make" a formulation of paint—wherein the formulation is merely the "recipe" or "formula" to the paint.  Thus, in this instance, the "formulation" is not necessarily the actual physical assembled product but instead the assembled product in the abstract (i.e., a representation of the assembled physical product).  In accordance, this assembled product in the abstract might also be called the product specification, which is the construction this Court adopts.

### d.  "trial formulations"

| Claim Language | eTool's Proposed Construction | National's Proposed Construction |
|---|---|---|
| 1. . . . presenting over the network to the customer supplier technical support information comprising a plurality of formulation constituent components including the at least one specialty component for each of said plurality of formulations corresponding to said set of characteristics received from the customer so that the customer may select different combinations of said components to be used with the at least one specialty component so as to allow the customer to create different **trial formulations** . . . ." | A formulation specifying a combination of particular components and having characteristics, corresponding to customer preferred characteristics. | A formulation that is being tested, to be chosen or retained only if suitable. |

The term "trial formulation" appears in claim 1 and other claims.  Plaintiff argues for the construction that reads "a formulation specifying a combination of particular components and having characteristics, corresponding to customer preferred characteristics."  Defendant seeks a construction that reads "a formulation that is being tested, to be chosen or retained only if suitable."

### 1.  The Parties' Construction Arguments

The Court quotes Plaintiff's argument, straight from its brief:

The claims themselves define the term "Trial Formulation." For example, claim 1 recites the following step that tells the reader what a Trial Formulation is:

> presenting over the network to the customer supplier technical support information comprising a plurality of *formulation constituent components including the at least one specialty component for each of said plurality of formulations corresponding to said set of characteristics* received from the customer so that the customer may select different combinations of said components to be used with the at least one specialty component *so as to allow the customer to create different trial formulations.*

When the italicized portions above are read together, they define Trial Formulation as:

> formulation constituent components including the at least one specialty component for each of said plurality of formulations corresponding to said set of characteristics so as to allow the customer to create different trial formulations

Or, simplified: trial formulation = constituent components for each formulation that corresponds to the (desired) characteristics. This is exactly what eTool's proposed construction says, but in more jury-accessible language. Because eTool's construction is taken from the clear language of the claim, it is, by definition, the correct construction.

(Plaintiff's Opening Brief, Dkt. No. 130, at 20-21.)   Other than some citations to the specification, which do not necessarily support Plaintiff's proposed construction, the quote above is basically Plaintiff's entire argument for its construction.  Plaintiff's construction appears to do three things: (1) cuts two pieces of the claim language from claim 1; (2) puts those two pieces together and ignore the language between the pieces; and (3) paraphrase the two pieces.

Defendant's argument for its claim construction is essentially a dictionary definition. Defendant relies on a dictionary definition for "trial" that reads "being tested: to be chosen or retained only if suitable."  *See* Oxford Compact English Dictionary (1996) at 1107.  From that, Defendant arrives to a construction of "trial formulation" as "a formulation that is being tested, to be chosen or retained only if suitable."  Defendant's brief tries to argue that the construction was somehow gleaned from the specification, but the specification gives no clear support for this construction.  As is clear from Defendant's construction, Defendant adopted the definition of "trial" word-for-word out of the Oxford Compact English Dictionary, and then added the word "formulation" to the definition.

## 2.  Analysis

The Court rejects both parties' proposed constructions.   The Court cannot adopt Plaintiff's construction because it is vague, ambiguous, and the Court cannot completely determine how Plaintiff came to its construction.   But Defendant's construction is problematic because it essentially adopts a dictionary definition that is not connected at all to the intrinsic record.

As a result, the Court adopts its own construction of "trial formulation," which reads "a sample formulation presented to the customer based on the customer's input wherein the customer may analyze or evaluate the sample formulation to determine if it is desirable."   The reasoning for the Court's construction is as follows.   First, the context of the claims themselves is not sufficient to determine a meaning of "trial formulation," therefore, the Court reviewed the specification.   Based on the direction of the parties' briefs, the Court finds that although the specification never uses the language "trial formulation," the specification is describing a "trial formulation" in its discussion of Figure 8, *see* '919 Patent, 10:59-11:6, and additionally in the specification's discussions of Figures 14-16, *see id.* at 11:65-12:26.

Specifically, in support of the Court's construction, although the specification does not specifically use the word "sample," the specification describes presenting sample formulations, under an ordinary meaning of the word sample.   *See, e.g.*, Webster's Third New International Dictionary 2008 (Merriam Webster, Incorporated 1993) (defining "sample" as "one that serves to illustrate the full range or scope" or "a part (as of a population) used for purposes of investigating and comparing properties" or "to give an impression or show an example of").   For example, the specification describes sample formulations when it states that "the matching results are output" from the customer's query, *see* '919 Patent, 10:67-11:1, or when the

specification discusses how a "set of formulations [are selected] matching the customer 20a's selections," *id.* at 11:63-64.

Additionally, the specification supports the Court's language that the sample formulations are "presented to the customer based on the customer's input." The specification describes how the "matching" results are output and the "customer can view the results." *See id.* at 11:1-2. Furthermore, the "trial formulations" are presented as a result of the customer's input. *See, e.g.*, *id.* at 12:8-9 ("Customer 20a may choose to compare various formulations that were *resulted from the selected inputs*.") (emphasis added). Even claim 1 describes how over the network there is received "from the customer a plurality of *inputs* indicative of a set of customer preferred characteristics." *Id.* at 14:30-32.

Finally, the specification supports the Court's language that "the customer may analyze or evaluate the sample formulation to determine if it is desirable." For example, the customer analyzes and evaluates the sample formulation when the customer "view[s] the results and requests comparison data." *Id.* at 11:1-3. Additionally, the specification describes how the customer compares the sample formulations, which obviously means the customer is analyzing and evaluating the formulations. *See id.* at 12:8-14. Finally, the specification describes that the purpose is to determine if a formulation is desirable. *See id.* at 11:5-6 ("the customer can select *desired* ones of the formulations to save for later, purchase components, etc.") (emphasis added); 12:15-26 (describing how the customer "locate[s] a formula of interest" and then potentially experiments with that formulation).[3]

---

[3] Note that one problem with Defendant's construction, in addition to it being merely a dictionary definition, is that it requires the formulation to be chosen or retained only if suitable. However, the specification never requires the customer to actually "choose or retain" the formula if it is found "suitable." Instead, the customer may merely use the trial formulation as a "starting point formulation . . . for testing purposes, experimentation, manufacture and so on." '919 Patent, 12:24-26.

As a result, for the reasons explained above, the Court construes "trial formulation" as "*a sample formulation presented to the customer based on the customer's input wherein the customer may analyze or evaluate the sample formulation to determine if it is desirable.*"

**e.  "modeling"**

| Claim Language | eTool's Proposed Construction | National's Proposed Construction |
|---|---|---|
| 2. The method of claim 1 further comprising the steps of: receiving over the network from the customer an input initiating **modeling** of the at least one trial formulation after the performance characteristics have been presented over the network to the customer; presenting over the network to the customer a **modeling** of the at least one trial formulation so as to simulate the actual performance of the formulation including changes in the performance with changes in the constituent components used in combination with the at least one specialty component. | To produce by computer a simulation or prediction of. | Revised construction: A model or simulation by a computer, or modeling or simulating done by a computer<br><br>Previous construction: A model or simulation, or modeling or simulating |

The term "modeling" appears in claim 2 and other claims.  The main dispute with this term was originally whether the "modeling" was required to be done by a computer.  Defendant now agrees that the "modeling" must be done by a computer.  Nevertheless, the parties are still disputing the term based on small differences in their proposed constructions.  Plaintiff proposes a construction of "to produce by a computer a simulation or prediction of."  Defendant has no substantive problem with the construction; rather, it has a grammatical problem: the construction does not account for the fact that sometimes "modeling" is used as a verb and sometimes a noun. Defendant's proposed construction is "a model or simulation done by a computer, or modeling or simulating done by a computer."  Like Defendant, Plaintiff has no substantive objections to

Defendant's construction; rather, Plaintiff argues Defendant's construction improperly uses the word "modeling" in the construction for "modeling"—which is not helpful.

Because Defendant makes no objection to Plaintiff's construction other than that it does not account for the use of modeling as a verb and noun, the Court essentially adopts Plaintiff's proposed construction and adjusts it to account for the verb and noun.  The Court construes "modeling" as "*a production by computer of a simulation or prediction of; or to produce by computer a simulation or prediction of*."

### f.  "computer database"

| Claim Language | eTool's Proposed Construction | National's Proposed Construction |
|---|---|---|
| "1. . . . classifying in the **computer database** the plurality of product formulations according to a set of product characteristics for each of said formulations; receiving over the network from the customer a plurality of inputs indicative of a set of customer preferred characteristics . . . ." | No construction needed.<br><br>In the alternative: "A medium populated with information used by a computer." | "A collection of logically related data stored together in one or more computerized files." |

The parties seek construction of the term "computer database," which appears in claim 1 and other claims.  Defendant gets its proposed construction from the IEEE Standard Dictionary of Electrical and Electronics Terms.  Plaintiff argues its construction is straightforward and fits with the claim's language, but Plaintiff otherwise provides little support for its construction.  In Plaintiff's Reply Brief, the only dispute it has with Defendant's proposed construction is that includes the limitation that the data must be "logically related."  (Dkt. No. 154, at 6.)  Plaintiff argues there is no support in the intrinsic record for the "logically related" limitation; rather, that

limitation comes from Defendant's dictionary definition.  The Court agrees with Plaintiff that the "logically related" limitation is improper.   And because Plaintiff has no other issues with Defendant's construction, the Court adopts Defendant's construction, but takes out the "logically related" limitation.   Thus, the Court construes "computer database" as "*a collection of data stored together in one or more computerized files.*"

### g.  "providing a computer database *comprising*"

Defendant essentially asks the Court to construe "comprising."   The Court declines to construe this term as Defendant requests, and instead, the Court will include its normal jury instruction regarding the use of the term comprising, which reads:

> *The beginning, or preamble, of some asserted claims uses the word "comprising."   "Comprising" means "including" or "containing but not limited to."   That is, if you decide that a Defendant's product or method includes all the requirements or steps in that claim, the claim is infringed.   This is true even if the accused product or method includes components or steps in addition to those requirements.*

> *For example, a claim to a table comprising a tabletop, legs, and glue would be infringed by a table that includes a tabletop, legs, and glue, even if the table also includes wheels on the table's legs.*

> *Similarly, in the case of a method claim, the word "comprising" means that the claim is infringed if all the claimed steps are performed, even if additional steps are also performed.*

### h. "classifying in the computer database the plurality of product formulations according to a set of product characteristics for each of said formulations"

| Claim Language | eTool's Proposed Construction | National's Proposed Construction |
|---|---|---|
| "1. . . . classifying in the computer database the plurality of product formulations according to a set of product characteristics for each of said formulations . . . ." | No construction needed.<br><br>In the alternative: Categorizing formulations such that the formulations are searchable in a computer database based on product characteristics. | Organizing and storing product formulations in the computer database according to product characterizations of the formulations. |

The parties dispute the construction of the phrase "classifying in the computer database the plurality of product formulations according to a set of product characteristics for each of said formulations." *See, e.g.*, '919 Patent, claim 1, 14:27-29. Plaintiff eTool proposes a construction that reads "categorizing formulations such that the formulations are searchable in a computer database based on product characteristics." Defendant National proposes a construction that reads "organizing and storing product formulations in the computer database according to product characterizations of the formulations." As Defendant admits in its Response Brief, the real dispute between the parties is whether "classifying" should mean "categorizing" as proposed by Plaintiff or "organizing and storing" as proposed by Defendant.

The Court adopts Plaintiff's construction because in the context of the patent, "classifying" should mean "categorizing." In support of each parties' construction, the parties mainly provide references to the specification where it mentions either "categorizing," "storing," or "organizing." The specification undoubtedly references all three terms, but the Court agrees with Plaintiff's construction for the following reasons. First, the specification uses the terms "categorize" and "classify" interchangeably. For example, the specification discusses how "the formulations are further *categorized* by application (e.g., siding, trim, walls, etc.). Further

*categories* apply to further *classify* and *categorize* the formulations." *Id.* at 8:43-45 (emphasis

added).   Second, the specification indicates that the "storing" step and the "classification" step

are not the same.  The specification states:

> After developing a standard classification system for a given product,
> Formulation Data sheets, Use guide, Test results and Test methods (various
> media) are collected from suppliers (step 704) and that formulation data is
> *formatted for storage in a database* (step 705). The gathered formulation data is
> *then classified* according to the previous designed classification system (steps
> 706, 707).

*Id.* at 10:47-54.  As this quote shows, the formulation data is first formatted to be stored, and

then the data is classified.  Therefore, classification, in the context of this patent, does not mean

organizing and storing.  As a result, the Court adopts Plaintiff's proposed construction, which

reads: "*categorizing formulations such that the formulations are searchable in a computer*

*database based on product characteristics*."

## V.     CONCLUSION

The Court adopts the constructions set forth in this opinion for the disputed terms of the

'919 Patent.  The parties are ordered that they may not refer, directly or indirectly, to each

other's claim construction positions in the presence of the jury.  Likewise, the parties are ordered

to refrain from mentioning any portion of this opinion, other than the actual definitions adopted

by the Court, in the presence of the jury.  Any reference to claim construction proceedings is

limited to informing the jury of the definitions adopted by the Court.

It is so ORDERED.

SIGNED this 13th day of September, 2011.

_____
T. JOHN WARD
UNITED STATES DISTRICT JUDGE